**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| INDRAWATIE SHIWBODH, | |
| Plaintiff, | No. 3:12-CV-01706 (MPS) |
| v. | |
| CARIBBEAN AIRLINES LIMITED, | |
| Defendants. | |

**MEMORANDUM OF DECISION**

Plaintiff Indrawatie Shiwbodh brought this action against defendant Caribbean Airlines Limited for injuries she allegedly suffered in the July 30, 2011 crash of Caribbean Airlines Flight BW523. After the case returned to this Court following consolidated multi-district litigation proceedings concerning the plane crash in the United States District Court for the Eastern District of New York, the parties agreed that the sole remaining disputes between them were whether the crash proximately caused the plaintiff's injuries and the amount of damages to which the plaintiff was entitled. To decide these issues, I held a three-day bench trial from December 11th to December 13th, 2017, and now set forth my findings of fact and conclusions of law, Fed. R. Civ. P. 52(a)(1), which can be summarized as follows: the defendant proximately caused the following injuries to the plaintiff: (1) her ankle injury through July 29, 2015; (2) her knee injury through September of 2012; (3) her back injury through October of 2011; and (4) her head injury through May of 2012; and I find that the plaintiff is entitled to $68,093.04 in economic damages and $204,279.12 for pain and suffering, for a total judgment amount of $272,372.16. In light of

this disposition, I deny the defendant's oral motion for judgment as a matter of law (ECF No. 62).

## I.    Findings of Fact

The Court makes the following findings of fact based on witness testimony, trial exhibits, and the stipulation of facts ("SOF") submitted with the parties' joint trial memorandum ("JTM").[1]

### A.  The Plaintiff's Background

The plaintiff is a forty-seven year old resident of Waterbury, Connecticut.  (Trial Transcript ("TT") at 10).  She was born in Guyana and came to the United States in 1988.  (*Id.* at 10-11).  She is currently married to Yadram Shiwbodh, and they have one child, Maleisa Shiwbodh.  (*Id.* at 16-17).  Shortly after arriving in the United States, the plaintiff attained a job at Covidien[2] as an assembler.  (*Id.* at 13).  She worked on an assembly line that produced hospital instruments.  (*Id.* at 13).  Her duties including assembling the instruments and putting them in trays.  (*Id.* at 14).  This activity included "bend[ing] and pick[ing] [the trays] up," and then lifting them onto a rack about six or seven feet away.  (*Id.* at 15-16).  The plaintiff spent "a couple hours standing" and a "couple hours sitting" each day as she performed her duties.  (*Id.* at 15).  She would hold this job until the events underlying this case.  In addition to her employment at Covidien, the plaintiff also did the majority of the household chores for her family.  (*Id.* at 21-23).

---

[1] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.  For example, although they are factual findings, my credibility findings are mostly set forth in the Conclusions of Law section for ease of discussion.

[2] At the time, Covidien was known as U.S. Surgical.  (TT at 13).

The plaintiff's health was generally good prior to 2011, with a few exceptions. She suffered from high blood pressure, hypercholesterolemia, and diabetes. (*Id.* at 18; Trial Exhibit ("Tr. Ex.") 10A). In 2007, the plaintiff was involved in a car accident. (*Id.* at 19-20; Tr. Ex. 25-A). She suffered a lower back injury as a result of the crash, and had to miss a short period of work. (*Id.*). She was diagnosed with "lumbar disc displacement" and prescribed various pain medications. (Tr. Ex. 25A). An x-ray taken a few weeks after the incident showed "[m]oderate degenerative changes of the L4-5 intervertebral disc," along with "evidence of a posterior annular fissure and broad based bulging. . . ." (Tr. Ex. 16CC). The plaintiff had difficulty performing her work for several weeks after the accident due to her injuries, but steadily improved with time. (Tr. Ex. 25B-E). By 2011, her back no longer hindered her ability to work. (TT at 20-21).

## B. The Plane Crash

On July 30, 2011, the plaintiff embarked on a vacation to Guyana with Yadram and Maleisa. (*Id.* at 24). She was traveling as a passenger on board Caribbean Airlines Flight BW523 from New York to Georgetown, Guyana. (SOF at ¶ 3-4). As the plane landed at Cheddi Jagan International Airport in Georgetown on the night of July 30, 2011, it overran the runway, resulting in the rupture of the plane's fuselage. (*Id.* at 4; TT at 25; Tr. Ex. 20B). The plaintiff's head hit the seat in front of her upon impact, leaving her with a gash on the top of her head. (TT at 25-26; Tr. Ex. 20A). After the plane skidded to a halt, Yadram opened an emergency exit onto the wing of the plane. (TT at 26). Yadram then proceeded through the emergency exit onto the wing of the plane, followed closely by the plaintiff. (TT at 28). The wing was suspended approximately 8-12 feet above the ground, which was sandy. (TT at 31; Exhibit 20A). Shortly after walking onto the wing, Yadram slipped and fell to the ground. (TT at 28). The plaintiff

then slid from the wing onto the ground after him.  (*Id.* at 29).  She landed on her feet and then "[fell] to the ground."  (TT at 31).  Shortly thereafter, the plaintiff left the area with the other passengers from the plane.  (TT at 32).  She walked for approximately two hours in search of the terminal with the other passengers.  (*Id.* at 93).  She was eventually taken to a hospital where she received more than 10 stitches on her head.  (TT at 32; Tr. Ex. 20B).  The plaintiff subsequently went to another hospital, which proceeded to redo the stitches on the plaintiff's head laceration. (TT at 33-34).

### C.  The Aftermath

Upon returning from Guyana, the plaintiff sought additional medical treatment for her injuries.  She complained initially of pain in the "right side of [her] scalp, head, neck, back, right leg, [and] both feet."  (Tr. Ex. 2A).  In August, 2011, her primary care provider, Dr. Lorenzo Galante, diagnosed her with neck pain, whiplash, a back sprain, a head injury, costochondritis (an inflammation of the cartilage connecting the ribs to the sternum) and posttraumatic stress disorder.  (*Id.*).  Various diagnostic imagery taken of the plaintiff did not demonstrate any fractures.  (Tr. Ex. 16A-16O).  By September, the plaintiff still complained of lower back pain, neck pain, headaches, and ankle pain.  (Tr. Ex. 2B).  The only image of note showed that the plaintiff had a "moderate degenerative change of the L4-L5 disc" with an "annular tear broad-based annular bulge," (Tr. Ex. 16N).  This finding was nearly identical to the plaintiff's injuries following her July, 2007 car accident.  (Tr. Ex. 16CC).  Over the course of the next few months, the plaintiff received injections in her back, knee, and right ankle to address her ongoing reports of pain in those areas.  (Tr. Ex. 5A-5D).  The injections had a temporary salutary effect but the plaintiff reported that the pain ultimately returned.  (Tr. Ex. 5D-5E; TT at 40).  She also took part in physical therapy at Village Street Physical Therapy in New Haven.  (*See* Tr. Ex. 3).  In the

interim, the plaintiff was unable to return to work or to perform household chores. (TT at 41-42).

In early 2012, the plaintiff continued to seek treatment for pain in her back, right knee, head, and right ankle. (Tr. Ex. 2G; 4F; 5E-F; 6A-C). Despite this continuing pain, the plaintiff attempted to return to her job at Covidien in the spring of 2012. (TT at 54-55). She was physically unable to perform the duties of her job, however, and was subsequently terminated. (TT at 55, 120-121). The plaintiff's treatment providers were unable to zero in on an exact cause of her symptoms. Her diagnoses ranged from post-traumatic fibromyalgia (*see* Tr. Ex. 2H) to "musculoskeletal strain injuries" (*see* Tr. Ex. 6B) to simply "right knee and right ankle pain symptoms" (*see* Tr. Ex. E). The plaintiff's recommended treatments were similarly varied. Dr. Michael P. Connair, an orthopedist, provided the plaintiff with therapeutic injections in her right knee. (Tr. Ex. 5E-F). Dr. Adam Mednick, a neurologist, recommended that the plaintiff engage in physical therapy and over the counter pain relief medications for her head pain. (*See* Tr. Ex. 6B). Dr. Judith Gorelick, also a neurologist, recommended that the plaintiff continue a conservative course of treatment involving physical therapy, weight loss, and exercise. (*See* Tr. Ex. 4G).

Despite this plethora of treatments, the plaintiff reported that her ankle, back, and right knee pain continued unabated during the summer of 2012. In late June, 2012, an x-ray of the plaintiff's right ankle revealed the existence of "[s]mall osteophytes"—bone spurs—and a small loose body. (*See* Tr. Ex. 5H). Dr. Connair concluded that these findings could be "degenerative or related to prior trauma," and that they could warrant further "arthroscopic exploration" to determine if they were the source of the plaintiff's ankle pain. (*Id.*). He later wrote the plaintiff a prescription for an "Arizona ankle splint" for her right ankle; the plaintiff did not fill the

prescription, however, due to the $400 copayment associated with the ankle splint. (Tr. Ex. 5I-J). In August, Dr. Connair noted that arthroscopic exploration of both the right ankle and the right knee could also be helpful. (Tr. Ex. 5I). The plaintiff also reported continuing lower back pain during this time period, and Dr. Galante prescribed her a number of painkillers for this condition. (*Id.*). The plaintiff's headaches, however, apparently diminished significantly during the summer of 2012. Dr. Galante wrote in July of 2012 that the plaintiff was "[n]o longer having headaches where she hit her head on [the] seat in front of her" during the plane crash and that she denied: "tingling/ numbness, paresthesia, weakness, dizziness, change in vision, [and] loss of consciousness." (Tr. Ex. 2L).

In October of 2012, the plaintiff underwent the first of several surgeries on her right ankle. Dr. Richard Zell performed the surgery—an ankle arthroscopy, debridement, and cheilectomy—on October 18, 2012. (*See* Tr. Ex. 7B-C). After the surgery, the plaintiff initially reported positive results. Dr. Zell noted a week after the surgery that the plaintiff stated that "her pain has been controlled overall"; he placed the plaintiff's ankle in a boot to heal. (Tr. Ex. 7D). A month after the surgery, however, the plaintiff reported "continued pain" and "persistent swelling," although she noted that "the sharp pain that she had before surgery is decreased." (Tr. Ex. 7E). Dr. Zell was satisfied with her progress. (*Id.*). Two months after the surgery, the plaintiff "[felt] like her recovery [was] going well" despite continued pain in her right ankle and she noted "significant improvement in her symptoms . . . compared to her preoperative condition. (Tr. Ex. 7G). By March of 2013, however, the plaintiff reported that the pain in her ankle was once again starting to increase. (Tr. Ex. 7H). Dr. Zell decided to recommence the treatment of the plaintiff's ankle with therapeutic injections. (Tr. Ex. 7I.).

In the meantime, the plaintiff's back pain worsened and her head pain returned after her ankle surgery. Dr. Martin Hasenfeld, a physiatrist in the same office as Dr. Gorelick, reported in November of 2012 that the plaintiff had noticed "increased pain in her low back." (Tr. Ex. 4H). He decided to recommence the injections into the plaintiff's back. (*Id.*). Unlike with the previous injections, however, the plaintiff reported that "she did not have much relief from these injections." (Tr. Ex. 4I). The plaintiff's headaches also apparently returned at some point during this period. Dr. Galante noted in October of 2012 that the plaintiff complained of a "headache." (Tr. Ex. 2M). An MRI of the plaintiff's head was normal, and Dr. Galante attributed the plaintiff's pain to a "tension headache." (Tr. Ex. 2N). She reported in February of 2013 that, although her headaches had undergone a "major improvement," they still lasted for an hour each day. (Tr. Ex. 2N). Dr. Galante prescribed her another pain medication for this condition and her headaches steadily improved, although they did not abate. (Tr. Ex. 2O).

The plaintiff's ankle, however, continued to deteriorate throughout 2013. After a series of injections provided little apparent relief, the plaintiff went to see Dr. Louis Iorio, a specialist in disorders of the foot and ankle, in May of 2013. (Tr. Ex. 9). Dr. Iorio noted that he was not "able to identify either on clinical exam, plain radiographs, or MRI scanning a specific clearcut cause for her diffuse symptomatology" regarding her ankle. (*Id.*). He suspected, however, that the plaintiff's pain most likely resulted "from early posttraumatic degenerative involvement particularly of the anterior aspect of the ankle." (*Id.*). He noted that such a diagnosis was "consistent with the arthroscopic findings of a loose osteochondral fragment at the anterolateral aspect of the distal tibia which was removed at the time of [the plaintiff's surgery in October of 2012]." (*Id.*). He concluded that there was not "any particular surgical intervention that [was] likely to improve [the plaintiff's] symptoms at this time especially given the more global nature

of her complaints." (*Id.*).[3] He did, however, recommend further treatment and provided his findings to Dr. Zell. (*Id.*). Dr. Zell noted in his next report, dated May 22, 2013, that the plaintiff had reported her ankle symptoms had worsened. (Tr. Ex. 7L). He stated that he told the plaintiff "that it is possible that she will have persistent symptoms . . . likely related to the injury that she had initially and chronic scarring" on her ankle. (*Id.*).

At this point, the plaintiff switched doctors and began treating with Dr. Enzo Sella, another orthopedic specialist. He noted that there was "an objective finding of peroneal tendon tear," and that this "necessitate[d] exploration and fixation." (Tr. Ex. 8A). Dr. Sella subsequently performed the plaintiff's second ankle surgery on August 21, 2013. During the surgery, however, he could not find a tear of the peroneal tendon. (Tr. Ex. 8C). He did perform some restorative maneuvers on the ankle tissue, including excising low-lying muscle fibers. (*Id.*). A month later, the plaintiff reported some residual swelling and numbness in a part of her foot. (Tr. Ex. 8G). Dr. Sella noted that such numbness would shrink to some extent but would always be present in that area of her foot. (*Id.*). Three months later, however, the plaintiff reported continued pain in her right ankle where she had had the surgery. (Tr. Ex. 8H). Dr. Sella prescribed her various painkillers as treatment. (*Id.*).

In the interim, the plaintiff reported that her headaches had worsened. She reported to Dr. Galante that her headaches continued "everyday 24/7, [in her] right ear and eye." (Tr. Ex. 2P). Dr. Galante prescribed her various painkillers and recommended that the plaintiff lose

---

[3] Dr. Iorio did take note of a May 6, 2013 radiograph that a radiologist had interpreted as demonstrating a tear of the peroneal tendon. (Tr. Ex. 9). He did not agree with the radiologist, however, and in any event concluded that the plaintiff's pain was not associated with any pathology concerning the peroneal tendon. (*Id.*). Dr. Zell agreed with this finding, noting that while the plaintiff's MRI demonstrated a peroneal tendon tear, "this is not the clinical area of her tenderness." (*See* Tr. Ex. 7L).

weight; he described the plaintiff as "grossly overweight." (Tr. Ex. 2P-R). In November of 2013, Dr. Galante noted that the plaintiff had begun complaining of dizziness associated with her headaches. (Tr. Ex. 2S). At this time, Dr. Galante concluded that the plaintiff's condition had "become chronic." (*Id.*).

The plaintiff sought continued treatment for pain. At a January, 2014 appointment with Dr. Sella, the plaintiff reported continued pain in her ankle. (Tr. Ex. 8I). Dr. Sella ordered an MRI and concluded that that plaintiff had tendinosis (damage to a tendon at a cellular level), and mild tendonitis in her right foot. (Tr. Ex. 8J). He determined that this meant the plaintiff was "still recovering from her injury" and that she was "not a surgical candidate anymore." (*Id.*). He also "released [the plaintiff] to a light duty type of work" with the condition that "she should not do any prolonged walking, climbing, or walking on uneven ground." (*Id.*). In April of 2014, Dr. Sella concluded the plaintiff was at maximum medical improvement, and that she had suffered "a total of 14% impairment and loss of function of the right foot and ankle." (Tr. Ex. 8K).

With respect to the plaintiff's headaches, Dr. Galante continued prescribing various cocktails of painkillers without any apparent success. (Tr. Ex. 2T-V). The plaintiff also visited a neurologist recommended by Dr. Galante, Dr. Moshe Hasbani, in January of 2014. (Tr. Ex. 10A). He concluded that the plaintiff had "[p]osttraumatic headaches" and potentially "posttraumatic temporomandibular joint dysfunction"—he also noted that the plaintiff had "early peripheral neuropathy likely . . . related to diabetes." (*Id.*). He recommended a trial of Nortriptyline, an antidepressant. (*Id.*). In August of 2014, the plaintiff reported continued pain in her head. (Tr. Ex. 2X). According to Dr. Galante's records, these complaints continued through the rest of the year and into the next. (Tr. Ex. 2Y-AA).

In April of 2015, the plaintiff turned to yet another orthopedist, Dr. Allen Ferrucci, in search of a salve for her ankle pain. Dr. Ferrucci noted that the plaintiff had "extensive scar tissue in her peroneal tendons and possibl[e] tearing in this area again." (Tr. Ex. 11A). He ordered an MRI, which he determined was "suggestive of pain that will not get better based on the tearing of the peroneal tendons." (Tr. Ex. 11B). He concluded that "an ankle arthroscopy with extensive debridement, [and] trimming of the peroneal tendons" could be helpful. (*Id.*). He also noted, however, that given arthritic changes in the ankle joint, the plaintiff could require "much more significant surgery including a possible [ankle fusion]" in the future. (*Id.*). In July of 2015, the plaintiff chose surgery. (Tr. Ex. 11D). Dr. Ferrucci performed the operation— which included a debridement and peroneal tendon repair—on July 29, 2015. (Tr. Ex. 11E). He reported that the plaintiff's "ankle was stable" at the end of the surgery. (*Id.*). In a follow-up appointment a week later, Dr. Ferrucci noted that the plaintiff had not been practicing proper post-operative care but that she was nonetheless progressing well. (Tr. Ex. 11F). Dr. Ferrucci instructed the plaintiff on the importance of proper post-operative care. (*Id.*). However, the plaintiff would continue to disregard Dr. Ferrucci's instructions to stay off of the ankle and to keep it elevated properly. (*See* Tr. Ex. 11G-I). Nonetheless, as of October, 2015, Dr. Ferrucci concluded that the plaintiff's ankle was healing as expected. (Tr. Ex. 11I).

Meanwhile, the plaintiff continued seeking new treatments for her headaches and back pain, along with treatment for her high blood pressure. She saw Dr. Hasbani again in June of 2015 for her headaches. (Tr. Ex. 10B). He noted that an MRI taken in March of that year showed "scattered punctate foci of increased T2 signal with [possible etiologies] including migraines, vasculopathy, and microvascular ischemic changes." (*Id.*). He also noted that there appeared to be "crepitation of the right temporomandibular joint and limitation of movement."

(*Id.*).  He instructed the plaintiff to continue taking the Nortriptyline and recommended that she see an oral surgeon.  (*Id.*).  The plaintiff also once again began seeking treatment for her back pain in June of 2015, this time from Dr. Kenneth Kramer, an orthopedist.  (Tr. Ex. 13A).  Dr. Kramer ordered an MRI and discovered an "L4-L5 bulge and annular tear," along with "a slight right-sided protrusion."  (Tr. Ex. 13D)  He concluded that "the L4-L5 disk [was] the proximal source of pain" and suggested the possibility of an "L3-L4, L4-L5 discogram."  (*Id.*).

The plaintiff also saw a new physician, Dr. Brian Coyle, a specialist in vascular disorders, in May and June of 2015.  (*See* Tr. Ex. 26A-B).  Dr. Coyle instructed the plaintiff on how to better control her blood pressure.  (*Id.*).  In November, 2015, Dr. Coyle recommended that she undergo a procedure to treat "severe reflux" in her "right great saphenous vein" on her leg.  (*See* Tr. Ex. 26C).  This procedure was performed successfully in December of 2015.  (*See* Tr. Ex. 26E).  While Dr. Coyle reported that this procedure apparently decreased swelling in the plaintiff's right leg (*see* Tr. Ex. 26F), there is no indication in the record that it improved the plaintiff's other injuries.  Dr. Coyle would later conclude that the plaintiff's right leg saphenofemoral reflux was not related to the plane crash.  (*See* Tr. Ex. 26G).

In the fall of 2015, the plaintiff's right knee pain returned.  Dr. Ferrucci noted in November of 2015 that in addition to the persistence of the plaintiff's ankle pain, the plaintiff also reported "a new complaint of knee pain."  (Tr. Ex. 11J).  He also wrote that the plaintiff "did not have any pain in her knee prior to this most recent surgery."  (*Id.*).  Dr. Ferrucci concluded that the plaintiff's new knee injury was connected to her ankle injury, and that "a change in her gait pattern [was] contributing and causing the knee pain."  (*Id.*).  In the meantime, the plaintiff's ankle injury persisted.  Dr. Ferrucci noted in January of 2016 that it "seem[ed] like the surgery has taken the edge [off] for [the plaintiff], but [that] she [was] still having significant pain at

times" in her ankle.  (Tr. Ex. 11K).  He noted that the plaintiff was "likely looking at [an ankle

fusion] at some point in the future, but [that he wanted] to try to delay that as long as possible,

and [the plaintiff] underst[ood] that."  (*Id.*).  At this time, the plaintiff also went to see a pain

specialist, Dr. Rakesh Patel, to help treat her ankle pain.  (Tr. Ex. 14A).

　　　The plaintiff sought further treatment for her back and head in the spring of 2016.  She

saw Dr. Kramer, who ordered another MRI of the plaintiff's back.  (Tr. Ex. 13E-F).  Dr. Kramer

noted that the MRI showed "[m]ild degenerative change with central disc protrusion at the L4-L5

level."  (Tr. Ex. 13F).  He also diagnosed the plaintiff with sciatica.  (Tr. Ex. F-G).  In March of

2016, the plaintiff returned to Dr. Hasbani seeking treatment for her continued head pain.  (Tr.

Ex. 11C).  He again concluded that the plaintiff suffered from "[p]osttraumatic headaches with

migraine-like components," along with myofacial pain.  (*Id.*).  He also noted that "[t]hese are

related to her injury suffered during the plane crash on July 30, 2011" but did not elaborate on

his rationale for this conclusion.  (*Id.*).

　　　As 2016 wore on, the plaintiff's right knee worsened while her ankle largely remained

the same.  Dr. Ferrucci noted in September that the plaintiff's ankle "ha[d] not changed

significantly" but that she complained of "increased pain in her right knee."  (Tr. Ex. 11L).  He

concluded that the plaintiff's worsening knee condition was "related to change in her gait pattern

related to her right ankle."  (*Id.*).  In October of 2016, Dr. Ferrucci diagnosed the plaintiff with

right ankle arthritis and chondromalacia patella in her knee.  (Tr. Ex. 11M).  By February of

2017, Dr. Ferrucci had concluded that the plaintiff had arthritis in both her ankle and her knee,

and that both would "require surgical intervention at some point due to the increased pain and

swelling that she [was] having."  (Tr. Ex. 11N).  In the interim, however, he provided the

plaintiff with a therapeutic knee injection.  (*Id.*).  He recommended a similar treatment for her

ankle.  (Tr. Ex. 11O).  Finally, he suggested that the plaintiff return to Dr. Kramer for her lower back pain.  (*Id.*).  She did so and Dr. Kramer reiterated his prior assessment of sciatica.  (Tr. Ex. 13H-I).

The plaintiff's symptoms continued on into the summer of 2017.  The plaintiff visited another neurologist, Dr. Deena Kuruvilla, in July of 2017.  (Tr. Ex. 15).  Dr. Kuruvilla conducted a full examination of the plaintiff and concluded that she suffered from chronic migraines and potentially also chronic pain syndrome.  (*Id.*).  In August of 2017, Dr. Ferrucci examined the plaintiff and noted that she still had "significant pain and discomfort" in "her knee and her ankle," and that she had developed a possible "large Baker's cyst" in her right knee.  (Tr. Ex. 15R).  He noted that the plaintiff "understands that she is looking at knee replacement of her right knee and a right ankle fusion at some point in the future" but that "[h]opefully, that can be delayed."  (*Id.*).

At trial, the plaintiff testified that she still has headaches "all the time," that the headaches have never let up since the crash, that the severity of the headaches has never varied (except "a little bit" when she takes Tylenol), and that her head pain "right now" rated a ten on a scale of one to ten.  (TT at 63-64).

## II.  Conclusions of Law

### A.  Warsaw and Montreal Conventions

The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1330(a) ("Actions against foreign states") as the defendant is a "foreign state" as that term is defined in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1603(a).  The parties are in agreement that the plaintiff's claims are exclusively governed by a treaty of the United States known as the Convention for the Unification of Certain Rules Relating to International Carriage

by Air, done at Montreal, Canada on May 28, 1999 ("Montreal Convention"), *reprinted in* S.

Treaty Doc. No. 106–45, 1999 WL 33292734 (1999). The Montreal Convention is essentially a

modern iteration of the Convention for the Unification of Certain Rules Relating to International

Transportation by Air, Oct. 12, 1929 ("Warsaw Convention"), 49 Stat. 3000 (1934), 137

L.N.T.S. 11, reprinted in 49 U.S.C. § 40105 note. *See Ehrlich v. American Airlines, Inc.*, 360

F.3d 366, 371 n. 4 (2d Cir. 2004) ("[T]he Montreal Convention is an entirely new treaty that

unifies and replaces the system of liability that derives from the Warsaw Convention.").

"The cardinal purpose of the Warsaw Convention . . . [was] to achiev[e] uniformity of

rules governing claims arising from international air transportation." *El Al Israel Airlines, Ltd. v.

Tsui Yuan Tseng*, 525 U.S. 155, 169 (1999) (internal quotation marks omitted). To achieve this

purpose, "the Warsaw Convention created a comprehensive liability system to serve as the

exclusive mechanism for remedying injuries suffered in the course of the international

transportation of persons, baggage, or goods performed by aircraft." *King v. American Airlines,

Inc.*, 284 F.3d 352, 356-57 (2d Cir. 2002) (internal quotation marks omitted). The Montreal

Convention, which entered into force in the United States in 2003, advances a similar goal. *See*

Montreal Convention, pmbl. (noting the goal of the state parties to the convention as

"reaffirming the desirability of an orderly development of international air transport operations

and the smooth flow of passengers, baggage and cargo. . .").  "Under the scheme provided for by

the Warsaw Convention and Montreal Convention . . ., passengers are 'denied access to the

profusion of remedies that may exist under the laws of a particular country, so that they must

bring their claims under the terms of the Convention or not at all.'" *Sanches-Naek v. TAP

Portugal, Inc.*, 260 F. Supp. 3d 185, 190 (D. Conn. 2017) (quoting *King*, 284 F.3d at 357).

The operative portion of the Montreal Convention in this case is Article 17. Article 17 provides that a "carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, Art. 17. This Article "subjects international carriers to strict liability for . . . injuries sustained on flights connected with the United States." *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 552 (1991).[4] To recover under Article 17, a passenger must prove that an "accident has . . . caused [her] to suffer" an injury. *Id.* Thus, to recover under the Montreal Convention, a passenger must demonstrate the existence of (1) an accident (2) that caused (3) an injury.

An "accident" for the purposes of the Montreal Convention is defined as "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985). An accident causes an injury for the purposes of the Montreal Convention if it proximately causes the injury. *See Margrave v. British Airways*, 643 F. Supp. 510, 512 (S.D.N.Y. 1986) ("Traditionally, courts have applied proximate cause analysis in determining an air carrier's liability under the Warsaw Convention."); *Dizon v. Asiana Airlines, Inc.*, 240 F. Supp. 3d 1036, 1045 (C.D. Cal. 2017) (granting summary judgment to defendant air carrier because plaintiff did not establish accident was proximate cause of injuries). Finally, an injury for the purposes of the Montreal Convention encompasses "death, physical injury, or physical

_____

[4] Since the "Montreal Convention 'still retains many of [the] original provisions and terms' of the Warsaw Convention,' . . . courts have continued to rely on cases interpreting equivalent provisions of the Warsaw Convention." *Sanches-Naek* 260 F. Supp. 3d at 190 (quoting *Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 205 (E.D.N.Y. 2012)). The Warsaw Convention's version of Article 17 is essentially identical to the Montreal Convention's Article 17. *See Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp. 3d 436, 441 (E.D.N.Y. 2014) (noting that Article 17 of the Montreal Convention is "nearly identical to Article 17 of the Warsaw Convention").

manifestation of injury." *E. Airlines, Inc.*, 499 U.S. at 552 (interpreting Article 17 of the

Warsaw Convention).  The Supreme Court has not addressed whether a passenger can recover

for a psychic injury accompanying a physical injury under Article 17.  *See id.* (noting that the

Court "express[ed] no view as to whether passengers can recover for mental injuries that are

accompanied by physical injuries").  The Second Circuit, however, has concluded that "mental

injuries are recoverable under Article 17 [of the Warsaw Convention] only to the extent that they

have been caused by bodily injuries."[5]  *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 400 (2d Cir.

2004).

Carriers are strictly liable under Article 17 for damages up to 100,000 Special Drawing

Rights (now approximately $160,000) per victim.  *See* Montreal Convention, Article 21(1);

*Etihad Airways, P.J.S.C.*, 870 F.3d at 422 ("The Montreal Convention imposes strict liability for

injuries that are compensable under Article 17(1), up to 100,000 SDRs per passenger, with a

decennial adjustment for inflation. . . .  The first official adjustment came in 2009, increasing the

strict-liability limit to 113,100 SDRs—or approximately $160,000—per passenger.").  A carrier

can cap damages against it at 100,000 Special Drawing Rights if it can prove that: "(a) [the

damage to the passenger] was not due to the negligence or other wrongful act or omission of the

carrier or its servants or agents; or (b) [that] such damage was solely due to the negligence or

other wrongful act or omission of a third party."  Montreal Convention, Art. 21(2).  The

---

[5]  The Sixth Circuit recently concluded that Article 17 of the Montreal convention allows recovery for "all . . . damage sustained from [an] incident, which includes damages for both physical injury and accompanying emotional or mental harm."  *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 409 (6th Cir. 2017).  The *Etihad* court specifically distinguished *Ehrlich*, in part on the basis that it was interpreting the Warsaw Convention.  *Id.* at 420.  As discussed below, I need not resolve any tension between *Etihad* and *Ehrlich*, however, because all of the plaintiff's mental injuries were caused by her bodily injuries.

defendant has not made such a showing in this case. As such, the cap does not apply to the plaintiff's claim.

## B. Proximate Cause

Caribbean concedes that the overrunning of the runway by Caribbean Airlines Flight BW523 on July 30, 2011 constituted an "accident" for the purposes of the Montreal Convention. It also concedes that it is "liable for bodily injuries [for] which there is sufficient evidence to show [that the plaintiff] suffered and that were proximately caused by the accident." (ECF No. 69 at 16). Thus, the only issue of contention between the parties is whether the crash of Caribbean Airlines Flight BW523 was the proximate cause of the plaintiff's injuries and the extent of those injuries. While "[a]ny injury is the product of a chain of causes," Article 17 "require[s] only that the passenger be able to prove that some link in the chain was an [accident.]." *Air France v. Saks*, 470 U.S. 392, 406 (1985). "Thus, courts apply proximate cause analysis in determining whether an unusual event is a link in the chain that led to an accident" under the Montreal Convention. *Cush v. BWI Int'l Airways, Ltd.*, 175 F. Supp. 2d 483, 487 (E.D.N.Y. 2001) (interpreting Article 17 of the Warsaw Convention). This analysis "requires that a plaintiff demonstrate an uninterrupted connection between the unusual event and the ultimate injury." *Id.* I address each of the plaintiff's claimed injuries in turn.[6]

### 1. Plaintiff's Ankle

For the reasons set forth below, I conclude that the plaintiff's right ankle injury was proximately caused by the defendant through her third ankle surgery, which was performed by Dr. Ferrucci on July 29, 2015. First, there is an unbroken chain of medical records from the time

---

[6] In particular, I address whether the plaintiff has proved by a preponderance of the evidence that each injury was proximately caused by the plane crash that took place on July 30, 2011.

of the plane crash documenting a persistent injury to the plaintiff's right ankle through that surgery. (*See* Tr. Ex. 2B (medical report from September 9, 2011 noting plaintiff complained of "right ankle pain"); Tr. Ex. 2G (medical report from February 28, 2012 noting continuance of right ankle pain); Tr. Ex. 2L (medical report from July 16, 2012 noting ongoing right ankle pain); Tr. Ex. 7A (medical report from September 25, 2012 noting plaintiff's continued complaints of right ankle pain); Tr. Ex. 7F (medical report from December 5, 2012 noting plaintiff was "still having pain and soreness" in her right ankle); Tr. Ex. 7H (medical report from March 5, 2013 noting "persistent pain" in plaintiff's right ankle); Tr. Ex. 8A (medical report from June 20, 2013 noting plaintiff's complaint of "severe, sharp, and constant" pain in her right ankle); Tr. Ex. 8H (medical report from November 14, 2013 noting patient's right ankle was still "symptomatic"); Tr. Ex. 2U (medical report from April 1, 2014 noting persistence of plaintiff's right ankle pain); Tr. Ex. 2X (medical report from August 28, 2014, noting continuation of plaintiff's right ankle pain); Tr. Ex. 2Z (medical report from December 4, 2014 noting ongoing pain in plaintiff's right ankle); Tr. Ex. 11A (medical report from April 6, 2015 noting continued presence of pain in plaintiff's right ankle)). Given the absence of any medical records indicating that the plaintiff's ankle troubled her prior to the plane crash or that she was not suffering significant ankle pain during this period, this unbroken line of records strongly suggests that the crash was a "link in the chain" of causes of the plaintiff's ankle pain. *See Saks*, 470 U.S. at 406.

Second, while their observations on etiology are often brief and may reflect the plaintiff's self-report, most of the plaintiff's medical providers have consistently noted that her ankle pain likely reflected an injury caused by the plane crash. (*See* Tr. Ex. 5A (office note of Dr. Connair on September 29, 2011, noting diagnosis that "[s]he has sustained ankle and diffuse foot injuries causing pain following the jump from a plane wing on 7/30/11"); Tr. Ex. 9 (report from Dr. Iorio

on May 10, 2013 noting that his "diagnosis [was] chronic *posttraumatic* nonspecific right ankle pain" (emphasis added)); Tr. Ex. 7L (report from Dr. Zell on May 22, 2013 noting that he told plaintiff that "it is possible that she will have persistent symptoms [in her ankle], which is *likely related to the injury that she had initially* and chronic scarring in this area" (emphasis added)); Tr. Ex. 2R (report from Dr. Galante on November 8, 2013 noting plaintiff's "condition has become chronic" and that "[t]here is a direct causal relationship between [the plaintiff's injuries] and the injury of July 2011"); TT at 34, 49) (statement by Dr. Ferrucci in deposition noting his opinion that it was "more likely than not" that the plane crash caused the plaintiff's ankle injuries and that the plaintiff suffered from arthritis in her ankle joint)).[7]  These providers' conclusions support the inference that the plaintiff suffered an injury to her right ankle as a result of the plane crash.

The chain of causation between the plane crash and the plaintiff's ankle injury was broken, however, by her failure to follow recommended proper post-operative care after her third ankle surgery in July of 2015.  Dr. Ferrucci's contemporaneous medical reports from the months after the surgery note repeatedly that the plaintiff did not practice proper post-operative care despite his repeated entreaties on the subject.  (*See* Tr. Ex. 11E (procedure note from Dr. Ferrucci dated July 29, 2015 noting that the postoperative plan for the plaintiff included her being "non-weightbearing"); Tr. Ex. 11F (medical report from August 6, 2015 from Dr. Ferrucci noting his concern "that the patient is fully walking on [her ankle]" and had "not been elevating the limb appropriately," and that he had "spent a great amount of time discussing that with her");

---

[7] Dr. Sella concluded that the plaintiff had suffered a permanent ankle injury.  (*See* Tr. Ex. 8K (report from Dr. Sella on April 3, 2014 noting that plaintiff's ankle was "at maximum medical improvement" and that she had "a total of 14% impairment and loss of function of the right foot and ankle")).

Tr. Ex. 11G (medical report from August 20, 2015 from Dr. Ferrucci noting plaintiff "has not been complying with her weight bearing status" or "elevating the limb appropriately," and noting that he had discussed with plaintiff "that she is still extremely swollen and tender . . . likely due to the fact that she was walking on [her ankle] after surgery, despite strict non-weight bearing precautions"); Tr. Ex. 11H (medical report from September 17, 2015 from Dr. Ferrucci noting that the plaintiff "has not been complying with her weight bearing status" or "elevating the limb appropriately," and noting that he once again "went over with [the plaintiff] that it has been very difficult postoperatively due to the amount of walking that she has done on [the ankle] without proper immobilization"); Tr. Ex. 11I (medical report from October 13, 2015 from Dr. Ferrucci noting that the plaintiff "has been complying with her weight bearing status" but "has not been elevating the limb appropriately," and noting that he once again "instructed the [plaintiff] in proper elevation procedures").  Given the plaintiff's failure to follow recommended proper post-operative care despite Dr. Ferrucci's repeated exhortations about the importance of doing so, along with his contemporaneous note that her failure to practice such care was actively worsening her injury (*see, e.g.*, Tr. Ex. 11G), I cannot conclude that her continued ankle pain after this point was proximately caused by the plane crash.

While the analysis set forth above militates in favor of a finding that the plane crash proximately caused the plaintiff's ankle injury through Dr. Ferrucci's surgery on July 29, 2015, the defendant's expert, Dr. Matthew Skolnick, presented strong testimony against drawing such an inference.  He concluded that the plaintiff suffered an ankle sprain due to the plane crash, but that the sprain effectively resolved within a few months.  (TT at 321-22.)  He suggested that the plaintiff's apparent continuing discomfiture after that point could be attributed to the plaintiff's diabetes (*id.* at 316), right saphenofemoral reflux (*id.* at 317), obesity (*id.* at 318), neuropathy

(*id.*), and arthritis (*id.* at 319).  (*See* also Tr. Ex. 24B (containing Dr. Skolnick's report advancing

the same conclusion)).  He also testified that none of the plaintiff's medical records or diagnostic

imagery concerning her ankle suggested a connection between the plane crash and her

continuing injuries.   He concluded that the plaintiff's ankle pain was "more likely related to

chronic swelling, circulatory problems, [or] neuropathy, rather than any structural problem in the

bones or joint or ligaments in the ankle."  (TT at 320).[8]

While Dr. Skolnick was a well-qualified and credible witness overall, I do not accept his

conclusions with regard to the plaintiff's ankle injuries for three reasons.  First, Dr. Skolnick

only evaluated the plaintiff once during an independent medical examination.  (*See* Tr. Ex. 24B;

TT at 332-33).  Dr. Ferrucci, along with the plaintiff's other providers, whose opinions are listed

above, saw the plaintiff numerous times over the course of the past five years.  Their ongoing,

real-time impressions of the persistence and nature of the plaintiff's ankle injury carry more

weight, especially because, taken together, they span a period of four years.  Second, as noted

previously, the timing of the injury—first incurred directly after the plane crash—, along with its

persistence through July of 2015, is also probative of a causal link between the plane crash and

the injury.  *See Messier v. United States*, 962 F. Supp. 2d 389, 411 (D. Conn. 2013) (concluding

that although parties' experts agreed plaintiff's injuries could have been caused by something

other than boat collision, the commencement of the plaintiff's injuries "right after the collision . .

. is persuasive evidence that the collision caused the [plaintiff's injuries]").  Third, although Dr.

Skolnick's observations about the effect on the plaintiff's ankle of her preexisting conditions do

---

[8]  As noted previously, Dr. Ferrucci, who testified for the plaintiff via a deposition played
at trial, reached a contrary conclusion.  (Tr. Ex. 11S at 80-81 (noting that plaintiff's ankle injury
was more likely result of trauma than neuropathy or various other conditions)).

cloud the picture somewhat, the fact remains that she was able to be more physically active and had no reported difficulties with her ankle before the plane crash. The medical records in this case, statements by Dr. Ferrucci, and the plaintiff's testimony (*see* TT at 31-79 (documenting her persistent ankle pain since the plane crash)) all suggest that the plaintiff's ankle pain was continuous since the plane crash and that this pain restricted her mobility.

For all of these reasons, I conclude that the plaintiff's right ankle injury was proximately caused by the defendant through July 29, 2015. I conclude that the plaintiff's right ankle injuries after that date were not proximately caused by the defendant. Consistent with the latter finding, I do not conclude that the plaintiff is entitled to damages for the future cost of an ankle fusion. Dr. Ferrucci testified in his deposition to his opinion that the plaintiff would likely need an ankle fusion in the future, but did not elaborate upon his reasoning for drawing this conclusion. (Tr. Ex. 11S at 54). Dr. Skolnick testified that the plaintiff would not need an ankle fusion. (TT at 341). I credit Dr. Skolnick for several reasons. First, I do not accept Dr. Ferrucci's conclusion that the plaintiff will need an ankle fusion given that he did not lay out his reasoning in support of this determination. Second, none of the plaintiff's ankle surgeries have alleviated her problems. In light of this history, the plaintiff has not presented evidence that yet another procedure on her ankle—which has already been operated on three times without lasting success—is likely to provide her with significant relief. Finally, Dr. Ferrucci concluded that the plaintiff needed an ankle fusion several years after the July, 2015 cutoff date for proximate causation; his medical records prior to that time do not note that the plaintiff will definitively need an ankle fusion. (*See* Tr. Ex. 11B (medical report from Dr. Ferrucci from April 23, 2015 noting "[his] concern is that eventually [the plaintiff] is going to be requiring much more significant surgery including a possible fusion versus ankle replacement" but that such a surgery

was not warranted at the time). Thus, even if the plaintiff currently does need an ankle fusion, her need was not proximately caused by the plane crash.

## 2. Plaintiff's Knee

The plaintiff's knee presents a more difficult question. As an initial matter, the plaintiff's medical records demonstrate that there were two stages of the plaintiff's knee injury. The first was the initial knee sprain the plaintiff suffered in the aftermath of the plane crash, which the defendant concedes it proximately caused. (*See* ECF No. 69 at 4 (conceding that the plaintiff suffered a "[s]prained right knee" as a result of the plane crash). The plaintiff's initial knee pain is noted in her medical reports through September of 2012. (*See* Tr. Ex. 4F (medical report from Dr. Hasenfeld from January 24, 2012, noting plaintiff's knee pain); Tr. Ex. 2G (medical report from Dr. Galante from February 28, 2012 noting same); (Tr. Ex. 2L (medical report from Dr. Galante from July 16, 2012 noting same); Tr. Ex. 5I (medical report from Dr. Connair from July 17, 2012 noting same); Tr. Ex. 7A (medical report from Dr. Zell from September 25, 2012 noting same). After this period, the overwhelming majority of the plaintiff's medical records do not contain any mention of knee pain until November of 2015.[9] In November of 2015, Dr. Ferrucci noted his opinion that the plaintiff's "new complaint of knee pain" was connected to her ankle pain. (*See* Tr. Ex. 11J). In particular he noted the following:

> As far as the knee goes, I think these [the ankle and the knee injuries] are definitely connected. [The plaintiff] was pain free in her knee until this most [recent] surgery and I think a change in her gait pattern is what is contributing and causing the knee pain.

---

[9] The exceptions to this are two reports from Dr. Galante—one in November of 2013 and one in February of 2014—noting that the plaintiff complained of knee pain. (*See* Tr. Ex. 2R; Tr. Ex. 2T). Dr. Ferrucci also noted that the plaintiff complained of knee pain just prior to the surgery in July of 2015. (*See* Tr. Ex. 11D). Since he noted in November of 2015 that the plaintiff did not have knee pain prior to her surgery, however, I conclude that this knee episode was either insignificant or had cleared up prior to the plaintiff's surgery.

(Tr. Ex. 11J). The plaintiff's knee pain worsened from there. (*See* Tr. Ex. 11K-Q).

Dr. Ferrucci eventually diagnosed the plaintiff with "Grade 4 chondromalacia patella"—i.e., a "full thickness degeneration of the cartilage [in the knee], with bony changes underneath as well." (*See* Tr. Ex. S at 45). He concluded that "a traumatic event was the cause" of this injury. (*Id.*). His only analysis in support of this conclusion, however, was as follows: "To develop Grade 4 changes without any reported trauma is very uncommon. I have not seen it in my professional career. I have not read about it." (*Id.*).

I conclude that the plaintiff has not established by a preponderance of the evidence that the plane crash proximately caused her knee injury beyond September of 2012. First, Dr. Ferrucci's contemporary medical reports suggest that his own surgery and its aftermath, as opposed to the plane crash, were the proximate cause of the plaintiff's knee injury. As noted previously, Dr. Ferrucci noted that he felt the change in the plaintiff's "gait pattern" following his surgery in July of 2015 "contribut[ed to] and caus[ed] [her] knee pain." (Tr. Ex. 11J; *see also* Tr. Ex. 11L (medical report from September 22, 2016 from Dr. Ferrucci making the same comment). He noted in that same report that the plaintiff "did not have any pain in her knee prior to this most recent surgery." (*Id.*). Second, as noted previously, Dr. Ferrucci's records following this surgery state repeatedly that the plaintiff did not follow recommended adequate post-operative care after the surgery in question. When combined with Dr. Ferrucci's contemporaneous conclusion that the plaintiff's knee injury likely resulted from a change in her gait due to the surgery, I find it more likely than not that the plaintiff's failure to practice proper post-operative care—and in particular, her walking on the injured ankle—contributed significantly to the development of this harmful gait and subsequent knee injury.

Finally, although Dr. Ferrucci's deposition testimony was on the whole quite credible, his analysis with respect to the plaintiff's knee injury was somewhat lacking. He concluded that the plaintiff's chondromalacia patella was likely caused by the crash due solely to the fact that he had not seen such changes occur in the absence of trauma in his professional career or read about it. Dr. Ferrucci, however, was only recently board certified in July of 2017. (Tr. Ex. 11S at 85). Further, as noted previously, this reasoning clashes with his contemporaneous account and the medical records in this case, both of which suggest that the plaintiff developed her knee injury as a result of her gait—and her failures to follow his instructions—after Dr. Ferrucci's July, 2015 surgery. Finally, Dr. Ferrucci described chondromalacia patella as a type of "arthritis of the posterior aspect of the patella . . . that is progressive with time." (*Id.* at 46). If this injury were truly caused by the plane crash in July of 2011, one would expect to see reports of the deteriorating condition of the plaintiff's knee pain throughout her medical records over the past seven years similar to the reports of her ankle pain. The absence of these consistent markers throughout the records suggest that the plaintiff's condition was not proximately caused by the plane crash. I also note that my conclusion that the plane crash's contribution to the knee pain ended in September 2012 finds support in Dr. Skolnick's testimony, which drew a line (albeit a shorter one) beyond which her knee pain could no longer be attributable to the plane crash. (*See* TT at 322).

I therefore conclude that the plaintiff has not demonstrated that the plane crash proximately caused her current knee injury. I do conclude, however, that the plaintiff has demonstrated that the plane crash was the proximate cause of her knee injury through September of 2012.

### 3. Plaintiff's Back Injury

The determination of the proximate cause of the plaintiff's current back injury is clouded by her prior back injury from the motor vehicle accident in 2007. At that time, the plaintiff was diagnosed with "lumbar disc displacement" and prescribed various pain medications. (Tr. Ex. 25A). An x-ray taken a few weeks after the 2007 accident showed "[m]oderate degenerative changes of the L4-5 intervertebral disc," along with "evidence of a posterior annular fissure and broad based bulging. . . ." (Tr. Ex. 16CC). The plaintiff testified that the associated back pain had cleared up by the time of the plane crash. (*See* TT at 20 (noting that her back felt "fine" and that she did not "have any pain [in her] back" before the plane crash)). As noted previously, however, an MRI of the plaintiff's back after the plane crash was effectively identical to an MRI taken after the 2007 car accident. (Tr. Ex. 16N; *see also* Tr. Ex. 5B (medical report from October 11, 2011 from Dr. Connair noting that an MRI scan of the plaintiff's spine "showed degenerative changes at L4-5 with an annular tear and broad based anular [sic] bulge, unchanged since 2007")). Thus, it is difficult to determine what, if any, portion of the plaintiff's back injury was caused by the plane crash. The defendant concedes that the plaintiff did suffer a back injury as a result of the plane crash. (*See* ECF No. 69 at 4 (conceding that plaintiff suffered "lower back strain" as a result of the plane crash)). It avers, however, that this injury was resolved by October of 2011. (*See id.*).

Although the medical records demonstrate that the plaintiff's low back pain troubled her more or less consistently over the years after the plane crash, (*see generally* Tr. Ex. 2 (describing repeated complaints from the plaintiff about low back pain between the plane crash and February of 2017)), her providers have been unable to identify the source of her symptoms. She has received a variety of diagnoses regarding the cause of her back pain since the plane crash, ranging from degenerative disk disease to sciatica. (*See* Tr. Ex. 4E (medical report from Dr.

Gorelick from December 1, 2011 diagnosing plaintiff with "[m]ild L4-L5 degenerative disk disease," "[m]echanical low back pain," and "[l]umbar strain"); Tr. Ex. 4G (medical report from Dr. Gorelick from May 20, 2012 diagnosing plaintiff with "[c]hronic right cervicalgia" and "[b]ack and right leg pain," ruling out "lumbar radiculopathy, compression"); Tr. Ex. 4J (medical report from December 6, 2012 from Dr. Hasenfeld diagnosing plaintiff with "lumbar degenerative disk disease and spondylosis at L4-L5, L5-S1"); Tr. Ex. 13A (medical report from Dr. Kramer from June 8, 2015 diagnosing plaintiff with sciatica and hip pain); Tr. Ex. 13G (medical report from Dr. Kramer from April 12, 2016 noting impression that plaintiff suffered from "[m]ild degenerative change with central disc protrusion at the L4-L5 level"). Thus, the plaintiff's medical providers have not agreed on a singular cause or characterization of her back injuries.

Further, the medical records regarding the plaintiff's back are much sparser than those regarding her ankle. It appears that, at times, substantial gaps occurred between her efforts to obtain treatment for her back. (*See, e.g.*, Tr. Ex. 13H (medical record from April 27, 2017 from Dr. Kramer noting plaintiff was "last seen 4/15/16 for back pain")). Finally, I found some of the plaintiff's evidence concerning the extent of her back injuries to be exaggerated or not current at the time of trial. For example, Dr. Galante noted in his November 14, 2013 report (upon which Dr. Joy's subsequent report was based), that the plaintiff "is able to sit for approximately 10 minutes at which time she needs to stand up for 10 minutes" due to her back pain. (*See* Tr. Ex. 2S at 5). And the plaintiff did stand at times during her trial testimony and while watching other witnesses over the three days of the trial. But she did not stand every ten minutes.

In light of these questions concerning the etiology and cause of the plaintiff's back pain, expert evidence was required to establish proximate cause between the plane crash and the

plaintiff's back injury.  *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004)

("Where . . . the nexus between [an] injury and the alleged cause would not be obvious to the lay

juror, [e]xpert evidence is often required to establish the causal connection between the accident

and some item of physical or mental injury.  In a case such as this, where an injury has multiple

potential etiologies, expert testimony is necessary to establish causation. . . ." (internal quotation

marks and citation omitted)).  The only expert evidence the plaintiff presented linking her back

injury to the plane crash came from her treating physician, Dr. Galante, who did not testify but

noted in several of his reports that there was a direct causal relationship between each of the

plaintiff's conditions and the plane crash of July, 2011.  (*See* Tr. Ex. 2R ("There is a direct causal

relationship between the above diagnosis and the injury of July 2011."); Tr. Ex. 2S (same)).

However, Dr. Galante did not present any reasons—other than pure temporal correlation—in

support of his conclusion in these reports.  And as noted, he did not testify and so his opinions

are essentially *ipse dixit*.  As a result, I do not credit his conclusion.  *Cf. Kumho Tire Co., Ltd. v.

Carmichael*, 526 U.S. 137, 157 (1999) (noting that a district court is not required "to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

     As a result, I cannot conclude that the plaintiff has established by a preponderance of the

evidence that the plane crash caused her present back injuries.  I do conclude, however, given the

defendant's concession on the point, that the defendant is responsible for the plaintiff's back

injuries through October, 2011.  (*See* ECF No. 69 at 4).

### 4.  Plaintiff's Head Injury

     The plaintiff's head injury presents another thorny question.  The defendant has

conceded that the plaintiff suffered from a "[s]calp laceration of approximately 8 centimeters

with associated temporary headache and dizziness" but asserts that this injury healed by

"October of 2011 at the latest." (ECF No. 69 at 4). For the following reasons, I conclude that the plaintiff has only established that her head malady was proximately caused by the plane crash through May of 2012.

As an initial matter, the plaintiff's medical records demonstrate that she has not consistently suffered from headaches since the plane crash. While the plaintiff testified at trial that she had suffered from continual headaches since the plane crash, (*see* TT at 63-64), the medical records contradict this statement. The plaintiff's medical records demonstrate that she complained of headaches through May of 2012. (*See* Tr. Ex. 2B-2G (medical reports from Dr. Galante from between August of 2011 and February of 2012 noting the plaintiff's complaints of head pain); Tr. Ex. 6C (medical report from Dr. Mednick from May of 2012 noting the plaintiff's continued complaints of head pain)). However, Dr. Galante noted in a report from July of 2012 that the plaintiff had informed him that she was "[n]o longer having headaches where she hit her head on [the] seat in front of her during hard plane landing." (Tr. Ex. 2L). Dr. Galante notes in his next record, from October of 2012, that the plaintiff complained of "headache since plan[e] accident." (Tr. Ex. 2M). As noted previously, however, this complaint was contradicted by his prior record. Dr. Galante's next report in early 2013 notes that the plaintiff's head pain had undergone a "major improvement," "lasting one hour one episode a day now." (*See* Tr. Ex. 2N (medical report from Dr. Galante from February of 2013 noting the plaintiff's complaint of a headache on her right side)). The plaintiff's complaints of headaches subsequently became somewhat more consistent from that date forward. (*See* Tr. Ex. 2O-II (medical reports from Dr. Galante between March of 2013 and February of 2017 documenting the plaintiff's complaints of head pain)). The plaintiff does not provide an explanation, however, for Dr. Galante's notation in July of 2012 that her headaches had ceased.

Further, the plaintiff's medical records contain a smorgasbord of diagnoses and findings concerning her headaches without a clear, consistent indication that they stemmed from the plane crash. A CAT scan taken of the plaintiff's head shortly after the plane crash displayed no evidence of a head injury. (*See* Tr. Ex. 16M (noting that the CAT scan showed "[n]o evidence of intracranial hemorrhage, extra-axial collection, or mass effect"). Another scan in March, 2015 showed only minor changes, and noted that "scattered punctuated foci of increased T2 signal" might stem from "possible etiologies includ[ing] migraine disease, vasculopathy, and microvascular ischemic changes." (Tr. Ex. 16X). Dr. Mednick concluded in the spring of 2012 that the plaintiff's headaches were likely attributable to "musculoskeletal strain injuries to her neck, shoulders, and lower back, in addition to tension-type headaches, and mild posttraumatic vestibular dysfunction." (Tr. Ex. 6B). Dr. Hasbani's "impressions" in the spring of 2014 were that the plaintiff's head pain was caused by either "[p]osttraumatic headaches" or "possible posttraumatic temporomandibular joint dysfunction." (Tr. Ex. 10A). In June of 2015, however, he concluded that the plaintiff simply had "[c]hronic daily headaches" and recommended that she see an oral surgeon. (Tr. Ex. 10B). He changed his diagnosis again in the spring of 2016, concluding that the plaintiff's headaches were "related to her injury suffered during the plane crash on July 30, 2011" but failed to provide any rationale for this conclusion. (Tr. Ex. 10C). Dr. Kuruvilla concluded in July of 2017 that the plaintiff's headaches were attributable to: (1) "[c]hronic migraine [without] aura [without] status migrainosus, not intractable;" (2) "[m]igraine without aura and without status migrainosus, not intractable;" and (3) "[c]hronic pain syndrome." (Tr. Ex. 15).

Then there was the plaintiff's trial testimony concerning her headaches, which I found, on the whole, not to be credible. She testified that her headaches had never stopped since the

time of the plane crash, and that they had never become less painful.  (TT at 63-64).  As noted, this is not consistent with the medical records summarized above.  Further, she described her pain, while she was testifying, as a "ten" out of ten "right now," (*id.*) this despite the fact that she was not holding her head or grimacing and that her voice remained steady and even throughout her testimony.  Indeed, during the entire three days of the trial—while she was testifying and while she was watching others do so—I saw her hold her head only once for a few minutes. During most of the trial, she appeared to be in no distress—and certainly not to be experiencing "ten out of ten" levels of pain.  She appeared to be focused intently on the proceedings.

With all of the differing potential etiologies concerning the plaintiff's head pain and the apparent abatement of her symptoms in July of 2012, expert evidence was necessary to draw the causal link between the plaintiff's head pain and the plane crash beyond that time.  *See Wills*, 379 F.3d at 46.  The plaintiff failed to present such evidence.  I can draw a straight line between the plaintiff's head injury following the crash—which the defendant concedes it caused (*see* ECF No. 69 at 4)—to the May, 2012 record from Dr. Mednick noting that he was treating the plaintiff "for continued evaluation of injuries suffered in a plane accident in July of [2011]."  (Tr. Ex. 6C).  After that, however, Dr. Galante's July report noting the abatement of the plaintiff's headaches and the 2015 MRI break the chain of causation between the plane crash and the plaintiff's head pain; and the plaintiff's trial testimony regarding her head pain was not credible.

I therefore conclude that the plaintiff has not established by a preponderance of the evidence that her head injuries following May of 2012 were proximately caused by the plane crash.  I do conclude, however, that her head injuries before that time were proximately caused by the plane crash.

### 5.  Plaintiff's Other Injuries

The plaintiff complains of various other injuries besides the ones listed above—to wit, depression, dizziness, insomnia, and numbness on her right side. (*See* ECF No. 70 at 16; TT at 46-47, 78, 81, 84). Some of these injuries, however, bear no apparent relationship to the plane crash. The plaintiff's numbness on her right side, for example, appears to have begun in April of 2012. (*See* Tr. Ex. 2I (medical report from Dr. Galante from April of 2012 noting plaintiff complained of "numbing"); ECF No. 70 at 6 (noting that the plaintiff "began reporting numbness in her extremities beginning on April 24, 2012). The plaintiff's first experience with dizziness occurred in November of 2013. (*See* Tr. Ex. 2R (noting plaintiff was experiencing "dizziness")). The plaintiff does not provide any non-speculative evidence linking either of these conditions to the crash. Given the many different possible causes of numbness and dizziness, along with the time lapse between the crash and the onset of these conditions, the plaintiff had to present expert testimony linking these conditions to the plane crash to establish proximate cause. Since she did not do so, I cannot conclude by a preponderance of the evidence that these conditions were proximately caused by the plane crash.

The depression and insomnia present a closer question. The plaintiff's medical records are replete with reports of her mental distress and depression due to the injuries she suffered from the plane crash. (*See, e.g.*, Tr. Ex. 2D (medical report from Dr. Galante from November 2, 2011 noting that plaintiff "feels stressed, insomnia [with] trouble sleeping 2 hours, depressed, crying a lot"); Tr. Ex. 2K (medical report from Dr. Galante from May 23, 2012 noting that plaintiff's "pain makes her depressed"); Tr. Ex. 2O (medical report from Dr. Galante from March 18, 2013 noting that the plaintiff was suffering from insomnia due to her injuries); Tr. Ex. 2R (medical report from Dr. Galante from November 8, 2013, noting that plaintiff was "unable to stay asleep she continuously wakes up because of pain especially the right side of the body");

Tr. Ex. 2X (medical report from Dr. Galante from August 28, 2014 noting plaintiff was unable to "finish a full night of sleep" due to pain); Tr. Ex. 2Z (medical report from Dr. Galante from December 4, 2014 noting the same); Tr Ex. 2EE (medical report from Dr. Galante from November 30, 2015 noting the plaintiff "appear[ed] depressed, tearful"); Tr. Ex. 2FF (medical report from May 25, 2016 noting the plaintiff "appears depressed"); Tr. Ex. II (medical report from Dr. Galante from February 23, 2017 noting that the plaintiff suffered from insomnia). The record clearly demonstrates that the plaintiff suffered emotional distress as a result of the bodily injuries and ensuing physical pain that themselves were a product of the plane crash.

### C.   Damages

#### 1.   Economic Damages—Medical Expenses

In light of my disposition, the plaintiff is entitled to economic damages for the following: (1) medical treatment for her ankle through July 29, 2015; (2) medical treatment for her knee through September of 2012; (3) medical treatment for her back through October of 2011; and (4) medical treatment for her head through May of 2012. I also conclude that she is entitled to damages for medical diagnostic imagery taken of her body in the immediate aftermath of the plane crash.

The plaintiff has failed, however, to present her damages in a comprehensible manner and has instead merely included a series of medical bills in the record. (*See* Tr. Ex. 17; Tr. Ex. 18).[10] The plaintiff also did not present any testimony linking these various bills to specific

---

[10] The plaintiff did include broad descriptions of the treatment providers (although not the actual treaters) for the specific subsections of Exhibit 17 in the table of contents for the exhibits admitted at trial. This table of contents, however, is not itself evidence. The plaintiff also included an "Appendix of Medical Bills" in her proposed findings of fact and law. (*See* ECF No. 70-1). This is also not evidence and, in any event, does not specifically link the medical bills in Exhibits 17 and 18 to the corresponding medical treatment reports in the record.

medical treatments.  Indeed, there was no testimony at all concerning the medical bills.  The defendant argues that the plaintiff's failure to introduce evidence at trial clearly linking her medical bills to particular treatments occasioned by her injuries means that she failed to carry her burden to prove any economic damages based on the costs of medical treatment.  (*See* ECF No. 69 at 22-23).  This is not a frivolous argument, because many of the medical "bills" submitted do not even indicate which provider they come from, let alone which injuries or procedure they correspond to.  While the plaintiff has sought to fill this gap through post-trial briefing, it was her obligation to introduce evidence at trial linking particular bills to particular treatment (or at least particular providers).  And while the index provided with the plaintiff's post-trial brief has been of some assistance in confirming links between some of her bills that bear clear signs that they were issued by particular providers for some of the plaintiff's treatments, it is not a substitute for evidence relating other bills—which consist only of lists of amounts and dates—to the plaintiff's injuries.  (*See, e.g.*, Tr. Ex. 17A).

In light of these deficiencies, I will award the plaintiff damages for only those medical bills admitted into evidence that contain: (1) a corresponding treatment report or other report reflecting the plaintiff's treatment; (2) a clear indication of which provider issued the medical bill; (3) a clear statement of the charges incurred; and (4) the date of the treatment.  And, of course, the plaintiff will receive damages only for medical treatment related to the injuries proximately caused by the defendant, as described above.  As for all other medical bills and charges, I find that the plaintiff has failed to meet her burden of proof.  I set out the list of medical charges that meet these standards in the table below.[11]

_____

[11]  The plaintiff would have been entitled to damages for the costs of her treatment from other providers such as Dr. Galante, but she did not provide enough information linking the bills in evidence to their treatment reports.  I was also unable to include most of the costs of her

**Medical Damages**

| Treatment Report | Provider | Date | Corresponding Medical Bill | Damages |
|---|---|---|---|---|
| Tr. Ex. 3 | Village Street Physical Therapy | 08/29/2011-11/9/2011 | Tr. Ex. 17B | $3,776.59 |
| Tr. Ex. 4D | Dr. Hasenfeld | 10/28/2011 | Tr. Ex. 17C | $900.00 |
| Tr. Ex. 5A | Dr. Connair | 9/28/2011 | Tr. Ex. 17D | $1,240.00 |
| Tr. Ex. 5B | Dr. Connair | 10/11/2011 | Tr. Ex. 17D | $980.00 |
| Tr. Ex. 5C | Dr. Connair | 10/21/2011 | Tr. Ex. 17D | $570.00 |
| Tr. Ex. 5D | Dr. Connair | 11/15/2011 | Tr. Ex. 17D | $525.00 |
| Tr. Ex. 5E | Dr. Connair | 02/28/2011 | Tr. Ex. 17D | $895.00 |
| Tr. Ex. 5F | Dr. Connair | 04/17/2012 | Tr. Ex. 17D | $895.00 |
| Tr. Ex. 5G | Dr. Connair | 06/05/2012 | Tr. Ex. 17D | $650.00 |
| Tr. Ex. 5H | Dr. Connair | 06/26/2012 | Tr. Ex. 17D | $690.00 |
| Tr. Ex. 5I | Dr. Connair | 07/17/2012 | Tr. Ex. 17D | $525.00 |
| Tr. Ex. 5J | Dr. Connair | 08/28/2012 | Tr. Ex. 17D | $525.00 |
| Tr. Ex. 6A | Dr. Mednick | 02/14/2012 | Tr. Ex. 17E | $290.00 |
| Tr. Ex. 6B | Dr. Mednick | 2/21/2012, 02/27/2012 | Tr. Ex. 17E | $2,372 |
| Tr. Ex. 6C | Dr. Mednick | 05/22/2012 | Tr. Ex. 17E | $165.00 |
| Tr. Ex. 7; Tr. Ex. 9 | Dr. Zell and Dr. Iorio | 09/25/2012-05/22/2013 | Tr. Ex. 17F | $7,495.00 |
| Tr. Ex. 8A | Dr. Sella | 06/20/2013 | Tr. Ex. 17G | $112.00 |
| Tr. Ex. 8B | Dr. Sella | 08/19/2013 | Tr. Ex. 17G | $130.00 |
| Tr. Ex. 8C | Dr. Sella | 08/21/2013 | Tr. Ex. 17G | $2,100.00 |
| Tr. Ex. 8D | Dr. Sella | 08/26/2013 | Tr. Ex. 17G | $0.00 |
| Tr. Ex. 8E | Dr. Sella | 09/03/2013 | Tr. Ex. 17G | $405.00 |
| Tr. Ex. 8F | Dr. Sella | 09/06/2013 | Tr. Ex. 17G | $0.00 |
| Tr. Ex. 8G | Dr. Sella | 09/12/2013 | Tr. Ex. 17G | $0.00 |
| Tr. Ex. 8H | Dr. Sella | 11/14/2013 | Tr. Ex. 17G | $130.00 |
| Tr. Ex. 8I | Dr. Sella | 01/16/2014 | Tr. Ex. 17G | $130.00 |
| Tr. Ex. 8J | Dr. Sella | 01/30/2014 | Tr. Ex. 17G | $155.00 |
| Tr. Ex. 8K | Dr. Sella | 04/03/2014 | Tr. Ex. 17G | $190.00 |
| Tr. Ex. 8L | Dr. Sella | 06/12/2014 | Tr. Ex. 17G | $130.00 |
| Tr. Ex. 8M | Dr. Sella | 07/21/2014 | Tr. Ex. 17G | $130.00 |
| Tr. Ex. 11A | Dr. Ferrucci | 04/06/2015 | Tr. Ex. 17G | $344.00 |
| Tr. Ex. 11B | Dr. Ferrucci | 04/23/2015 | Tr. Ex. 17G | $190.00 |
| Tr. Ex. 11C | Dr. Ferrucci | 06/04/2015 | Tr. Ex. 17G | $130.00 |
| Tr. Ex. 11D | Dr. Ferrucci | 07/27/2015 | Tr. Ex. 17G | $130.00 |

medications due to her failure to include any sort of description of the function of the medications prescribed; I did include all of the medication prescribed by Dr. Galante through October, 2011.  (*See* Tr. Ex. 18).

| | | | | |
|---|---|---|---|---|
| Tr. Ex. 11E | Dr. Ferrucci | 07/29/2015 | Tr. Ex. 17G | $17,430.00 |
| Tr. Ex. 16A-L | Meriden Imaging Center[12] | 08/19/2011 | Tr. Ex. 17O | $1,162.00 |
| Tr. Ex. 16N | Whitney Imaging Center | 09/12/2011 | Tr. Ex. 17L | $1,159.22 |
| Tr. Ex. 16O | Whitney Imaging Center | 10/06/2011 | Tr. Ex. 17L | $992.42 |
| Tr. Ex. 16P | Whitney Imaging Center | 10/13/2011 | Tr. Ex. 17L | $992.42 |
| Tr. Ex. 16R | Whitney Imaging Center | 02/20/2012 | Tr. Ex. 17L | $2,134.80 |
| Tr. Ex. 16S | Whitney Imaging Center | 06/13/2012 | Tr. Ex. 17L | $899.03 |
| Tr. Ex. 16V | Yale New Haven Hospital | 05/06/2013 | Tr. Ex. 17J | $2,438.00 |
| Tr. Ex. 16W | Dr. Sella | 01/17/2014 | Tr. Ex. 17G | $1,400.00 |
| Tr. Ex. 2A-C | Rite Aid Charges for Medications Prescribed by Dr. Galante | 8/19/2011-10/31/2011 | Tr. Ex. 18 | $182.95 |
| | | | **Total Damages** | **$55,690.43** |

As the table above demonstrates, the total amount of economic damages for medical expenses to which the plaintiff is entitled is **$55,690.43**.

The plaintiff noted in her proposed findings that, "prior to the entry of a Final Judgment in this matter, the Court should receive evidence as to the total amount of collateral sources (e.g., insurance) which have been paid for Mrs. Shiwbodh's benefit. *See* Con[n]. Gen. Stat. § 52-225A." (ECF No. 70 at 19); *see also* Conn. Gen. Stat. § 52-225a(a) ("In any civil action . . . wherein the claimant seeks to recover damages resulting from (1) personal injury . . . wherein

_____

[12] The corresponding treatment reports for Meriden Imaging Center Inc. are labelled "Radiology Associates, Inc." (*See, e.g.*, Tr. Ex. 16A). However, the treatment providers mentioned in the reports in Trial Exhibit 16 match up with those mentioned in Trial Exhibit 17O. I therefore conclude that Radiology Associates, Inc. is the same entity as Meriden Imaging Center Inc. I also note that the addresses match. (*See* Tr. Ex. 16A; Tr. Ex. 17O).

liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages . . . by an amount equal to the total amounts determined to have been [collateral sources]. . . .").  The defendant has not raised this issue.  In any event, there is a federal analog to Connecticut's collateral source statute that dictates that there should be no reduction for collateral source payments.

The federal "collateral source rule is a substantive rule of law that bars the reduction of an award by funds or benefits received from collateral or independent sources."  *King v. City of New York*, No. 06 CIV. 6516SAS, 2007 WL 1711769, at *1 (S.D.N.Y. 2007).  The purposes of the collateral source rule include "ensur[ing] that tortfeasors bear the costs of their own conduct," and "protect[ing] plaintiffs who have the foresight to obtain insurance."  *Johnson v. Cenac towing, Inc.*, 544 F.3d 296, 304-05 (5th Cir. 2008) (internal quotation marks omitted).  The collateral source rule "applies to cases governed by federal law. . . ."  *King*, 2007 WL 1711769 at *1; *see also see also Hartnett v. Reiss S. S. Co.*, 421 F.2d 1011, 1016 n. 3 (2d Cir. 1970) ("The general rule in the federal courts is that the collateral source rule is applied and defendants cannot show payments of this kind in mitigation.");  *Solis-Diaz v. Las Vegas Metro. Police Dep't*, No. 212CV00619JADGWF, 2017 WL 374908, at *2 (D. Nev. 2017) ("Because this case arises under federal-question jurisdiction, I apply the federal, common law collateral-source rule."). Given that the application of the Montreal Convention presents a federal question, *see Biscone v. JetBlue Airways Corp.,* 681 F. Supp. 2d 383, 386 (E.D.N.Y. 2010) ("Because the Montreal Convention does in fact provide a federal cause of action, a claim under the Montreal Convention presents a federal question sufficient to invoke federal jurisdiction."), I apply the federal collateral source rule to this case in lieu of Connecticut's collateral source statute.  *See*

*Danner v. Int'l Freight Sys. of Washington, LLC*, 855 F. Supp. 2d 433, 475 (D. Md. 2012)

(applying federal collateral source rule rather than state collateral source law as a matter of

federal common law to federal tort claim). Thus, I do not reduce the plaintiff's medical damages

on account of her insurers' payments.

### 2. Economic Damages—Lost Earnings

The plaintiff claims lost wages for her past inability to work and lost earnings capacity

for her future inability to work due to her injuries. At trial, the plaintiff presented the testimony

of Dr. Jeffrey Joy, who testified that "based upon [his] findings," the plaintiff is "incapable of

performing any unskilled work that would be within her function[al] limitations." (TT at 182;

*see also* Tr. Ex. 21 (Dr. Joy's report attesting to the same conclusion)). At trial, the following

exchange took place between Dr. Joy and myself:

> Court: So do you have an understanding – with regard to the functional limitations set
> forth in your report, do you have an understanding of which functional limitations derive
> from injuries to particular body parts? So, for example, she's going, according to Dr.
> Galante, it's likely she'd be absent from work four times a month . . . . Do you know
> whether that's because of the ankle, the knee, the headaches, the back, or the combination
> thereof, or you're just not able to say?
>
> Dr. Joy: I'm not able to say
>
> . . .
>
> Court: Do you have an opinion about whether Ms. Shiwbodh would be able to work if,
> for example, she had exactly the same thing happen to her ankle, exactly the same thing
> happen to her knee, but no back injury and no headaches attributable to the crash, are you
> able to say one or another?
>
> Dr. Joy: I have an opinion about that. Although I clearly can't state where one begins and
> one ends, particularly with the lower back and the ankle. For instance, both the ankle and
> the back are involved in weight bearing, for example. So as to why the physician said no
> more than five pounds, whether that speaks to the ankle, the back, or to some
> combination thereof, I can't say. She seems to also have some upper extremity
> limitations.
>
> . . .

Court: Is it accurate, though, you were asked to take the medical records and the function[al] . . . limitations expressed therein as an assumption in your analysis?

Dr. Joy: Certainly.

Court: And you . . . weren't asked to parse out that assumption based on particular injuries, is that fair?

Dr. Joy: That's correct. And sometimes I'm able to do that if there are varying treaters that are just treating certain body parts. But in this example Dr. Galante, for example, was treating a number of systems.

(TT at 216-217). Dr. Joy formed his opinion about the plaintiff's inability to work based in particular upon the description of her injuries and functional limitations set forth in Dr. Galante's November 14, 2013 letter to the plaintiff's lawyer. (*See* Tr. Ex. 2S; Tr. Ex. 2I at 6; TT at 183-84, 215-16). He was not asked to and did not determine the impact of each of the plaintiff's individual injuries upon her work capability. As such, his conclusion rests in part upon the effects of injuries I have concluded were not caused by the defendant's conduct—i.e., the plaintiff's knee injury beyond September of 2012, back injury beyond October of 2011, and head injury beyond May of 2012. I therefore have no choice but to disregard his opinion as to lost earnings capacity.[13]

The plaintiff is still entitled to damages, however, for the period she was out of work between the plane crash and October of 2011 in light of the defendant's concession that her injuries during this time period were proximately caused by the plane crash. (ECF No. 69 at 16). To calculate these damages, I rely upon the portion of Dr. Joy's report setting out the plaintiff's cumulative lost earnings. (Tr. Ex. 21). In his report, Dr. Joy calculates the plaintiff's lost earnings from July 30, 2011, to August 13, 2011 as $1,807. (*Id.* at 11). He then calculates

---

[13]    It is also worth noting that Dr. Ferrucci stated in his deposition that the plaintiff was still able to perform sedentary work despite her ankle and knee injuries. (*See* Tr. Ex. 11S at 85).

her lost earnings over the next calendar year as $48,959. (*Id.*). After August 13, 2011, the defendant was responsible for the plaintiff's injuries through October 31, 2011—another seventy-nine days. Proportionally, this equates to $10,595.61 worth of damages over this time period based upon Dr. Joy's calculations. Combining the amounts for the above periods, the plaintiff is entitled to economic losses for lost earnings totaling **$12,402.61**.

### 3. Pain and Suffering

"Unlike pecuniary losses, [pain and suffering and emotional distress] damages are, by their nature, not susceptible to mathematical computation. Consequently, the law does not provide a precise formula by which pain and suffering and emotional distress may be properly measured and reduced to monetary value.*" Mathie v. Fries*, 935 F. Supp. 1284, 1304–05 (E.D.N.Y. 1996). Nonetheless, "guidance may be found by referring to analogous cases involving similar injuries." *Byrnes v. Angevine*, No. 3:12-CV-1598 GLS/DEP, 2015 WL 3795807, at *2 (N.D.N.Y. 2015).

Connecticut law contains scant case law addressing plaintiffs with only ankle injuries. In the cases with such analogous injuries, however, courts have been fairly generous in providing damages for pain and suffering relative to the total amount of economic damages. *See, e.g.*, *Angeloni v. Tilcon Connecticut, Inc.*, No. CV90497099S, 2001 WL 1159782, at *3 (Conn. Super. Ct. June 21, 2001) (awarding plaintiff who suffered a ten percent permanent disability of the left ankle more than four times as much for pain and suffering as for economic damages); *Guess v. Hellsund*, No. 532332, 1995 WL 780884, at *1–2 (Conn. Super. Ct. Dec. 18, 1995) (awarding plaintiff who suffered a twenty-eight percent impairment of his foot more than seven times as much for pain and suffering as for economic damages); *Naquan Murphy v. 210 Burwell Ave., LLC et al.*, No. NNHCV156053354S, 2018 WL 1041499, at *2 (Conn. Super. Ct. Jan. 26, 2018)

(awarding plaintiff who suffered ankle injury more than twice as much for pain and suffering as for economic damages).

In this case, the record plainly demonstrates the negative impact of the plaintiff's ankle injury upon her life. She testified credibly to the precipitous downturn her life has taken since the plane crash. Before the plane crash, she nearly singlehandedly took care of her family while working at Covidien. (*See* TT at 21-23). Her husband, Yadram, testified that the plaintiff would "do all the housework"—i.e., "cook, clean, laundry, . . . groceries." (*Id.* at 127). After the plane crash, the plaintiff lost a substantial portion of her mobility, and ultimately her sense of emotional wellbeing. While not all of this is attributable to the plaintiff's ankle injury, that injury nonetheless played a significant contributing role. Finally, the plaintiff's medical records demonstrate that her ankle caused her constant pain in the years following the plane crash. Given the toll that the plaintiff's ankle injury has taken upon her wellbeing, even in the four years from the plane crash until July 2015, I award her triple the amount of her economic damages, **$204,279.12**, for her pain and suffering.

## III. Conclusion

On the basis of all of the evidence and the arguments of the parties, the Court finds that the defendant proximately caused the following injuries to the plaintiff: (1) her ankle injury through July 29, 2015; (2) her knee injury through September of 2012; (3) her back injury through October of 2011; (4) her head injury through May of 2012. The Court therefore enters judgment in favor of the plaintiff in the amount of **$68,093.04** in economic damages and **$204,279.12** for pain and suffering, leading to a total judgment amount of **$272,372.16**. In light of this disposition, I deny the defendant's oral motion for judgment as a matter of law (ECF No.

62). The Clerk is instructed to enter judgment in favor of the plaintiff in the amount of

**$272,372.16** and to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
        March 27, 2018